## MARGARET WILSON, Alias MARY CRAIG, Appellant, v. MARY LOUISE CRAIG et al.

### Division Two, June 9, 1903.

1. **Dower:** VOLUNTARY ABANDONMENT OF HUSBAND. The Missouri statute, that, "if a wife voluntarily leave her husband and go away with an adulterer . . . she shall forever be barred from having jointure or dower, unless her husband be voluntarily reconciled to her, and suffer her to dwell with him," announces a principle of sound morality and public policy.

2. ———: ———: WHAT IS ABANDONMENT? Any separation from her husband, which is demonstrated by her acts and conduct to be voluntary, and which is not brought about by the acts of her husband, or by any restraint upon her person, is, 'within the meaning of this statute, voluntarily leaving him. It is not necessary that there should be any special form adopted in the leaving and separation. If her acts concur in substance with the meaning of the statute, though they do not in form, they amount to a bar of the dower.

3. ———: ———: FINDINGS OF THE TRIAL COURT. Where the testimony reasonably supports them, the appellate court will defer to the findings of fact by the trial court, in a suit to bar a wife of dower in her husband's estate, to the effect that she had voluntarily left him and gone away with an adulterer.

4. ———: ———: MARRIAGE AFTER SEVEN YEARS. A wife can not, after making up her mind to no longer live with her husband, and after she has lived seven years separate and apart from him, under a belief that she is free by the law of God and man to marry again, but knowing that he is still alive, marry another, and after the death of that other claim dower in her former husband's estate.

Wilson v. Craig.

5. ——————: ——————: CASE STATED. Plaintiff and deceased were married in Ireland, and about the time their first child was born he concluded to come to America, and desired her to come with him, but her parents objected on the ground of her very delicate health and her doctors advised against her making the hazardous journey. He came, and wrote her a kind letter, which she answered; he wrote her a second letter, in which he spoke kindly of her but offensively of her proud parents, and stated he was going "to the territories." She did not answer this letter, but consulted a minister, who informed her that in seven years she would be free before God and under the laws of man to marry again. Soon afterwards she came to Philadelphia for a year's visit to her sister, who was the wife of her husband's brother, but with no purpose to be reconciled to him. He had come to St. Louis, and remained there, and this she well knew, but she remained in Philadelphia and made no effort to go to him. He visited Philadelphia, but did not call on her, although he did on her brother, but she did not know of his visit. Then eleven years after he had left Ireland, she says she was told by this brother, when another asked her in his presence to marry him, that her husband was dead, and that thereupon a council of ministers informed her that she was free to marry again. After she had done so and heard that her former husband was alive, she inquired of this brother why he had told her her husband was dead, to which he replied that he was dead to her. There was no divorce, but ten or twelve years later the husband married again, and her second husband died fifteen years later, and the first husband twenty-seven years after the second, and in this suit in partition she is claiming dower in the first husband's estate, as his widow. *Held, first,* that the court was not bound to believe her statement that her husband's brother told her her husband was dead when she was asked by the second husband to marry him, since that testimony is irreconcilable with the other testimony; *second,* her refusal to come with her husband to America, her consulting the minister in Ireland, her failure to answer his second letter, her visit to America with no intention of being reconciled to her husband, her failure to make any attempt to in anywise communicate with him after her arrival in America, although she lived with his brother and knew his whereabouts, her consulting the ministers again when she wished to marry the second time, all indicate that from the time she had received the second letter, she had determined never to live with him again, and that determination, culminating in and coupled with her second marriage, which must be held under the statute to be adulterous, forfeits her dower.

Appeal from St. Louis City Circuit Court.—*Hon. P. R. Flitcraft,* Judge.

AFFIRMED.

*L. Frank Ottofy* for appellant.

(1)   A widow is entitled to a partition after filing her election and it is not necessary that there should have been a final settlement of the estate.   Plaintiff need not plead that there is sufficient other property or that the estate is closed; this is matter of defense.   Rhorer v. Brockhage, 15 Mo. App. 22.   (2)   When the election is made under sections 4523 and 4524, as in this case, the interest vests in the widow absolutely.   It is a vested and fixed interest.   Matney v. Graham, 50 Mo. 564; Wigley v. Beauchamp, 51 Mo. 547.   (3)   The defendants, Mary Louise Craig and Emma Craig, are legitimate children and inherit equally.   Lincecum v. Lincecum, 3 Mo. 441; Green v. Green, 126 Mo. 17.   (4)   Under the statute of Westminster II., which is substantially the same as section 4532, Revised Statutes 1889, in order to bar the wife of dower she must have left her husband.   In the case at bar all the evidence shows that it was the husband who left the wife, and therefore the statute does not apply.   Where the wife is unable to leave with her husband by reason of illness, as is the case at bar, or where the husband abandons her, as is the case here, and throws her upon her relatives for support, and she afterwards goes to live in adultery, the statute does not apply.   Payne v. Dotson, 81 Mo. 147; Hoyt v. Davis, 21 Mo. App. 242, 30 Mo. App. 309; Reel v. Elders, 62 Pa. St. 316; Graham v. Law, 6 Jones (Upp. Can.) 310; Walters v. Jordan, 13 Ired. (S. C.) 361; Schaffer v. Richardson, 27 Ind. 122; Cogswell v. Tibbetts, 3 N. H. 41; 2 Scribner on Dower (1883 Ed.), pp. 531, 534, 536; Crabb on Real Property, p. 173.

*A. R. Taylor* for respondents.

(1)   As this case was tried in the lower court without a jury, and the sole question was one of fact as to whether the appellant had voluntarily separated from

her husband and remarried Wilson, the finding of fact by the trial court is conclusive upon this court of the fact, and its action will not be reviewed by this court. Hafner v. St. Louis, 161 Mo. 41. (2) The evidence in this case shows that there was an abandonment of the deceased by the plaintiff, without legal cause or excuse, and an attempted marriage by the plaintiff Thomas Wilson during the life of James Craig, when both the plaintiff and Wilson knew that Craig was living and unmarried—a continuous cohabitation by the plaintiff with Wilson from the alleged marriage in 1844, or 1845, until Wilson's death. James Craig did not abandon the plaintiff. She admits that he left her in Ireland, she consenting to his coming to America, and she being unwilling to come with him on account of her health. Craig, therefore, in no sense abandoned her when he left Ireland. After leaving her in Ireland and reaching America he wrote her hopefully of being able to send for her. She answered the letter. Craig wrote her a second letter, kind to her, but, as she testifies, disrespectful to her father and brothers—saying he was going to the territories, as she puts it, but she knew he came to St. Louis. With no other provocation than this letter, offensive to her father and brothers, she breaks off all communication with Craig, and determines, under the advice of her father, upon a final separation from Craig. Craig is dead. She never breathed the claim that Craig abandoned her until his lips were sealed in death. In all the eleven years prior to her marriage to Wilson, when she knew perfectly well where Craig resided, when he came to the same house in Philadelphia where she lived, did she claim he abandoned her? No. She didn't see him. Did she wish to see him? No. This was before she married Wilson. Craig was living alone. He did not marry the mother of the defendants until May 20, 1856, twelve years after she married Wilson. Her whole evidence shows that while in Ireland, under the advice of her father, she

irrevocably determined to separate from Craig. Hoyt v. Davis, 21 Mo. App. 242; McAllister v. Novenger, 54 Mo. 358.

FOX, J.—This is an action for partition of real estate described in the petition. That we may fully appreciate the issues determined by the trial court, we here quote substantially the pleadings in this cause:

The amended petition alleges that on the 24th day of March, 1897, James Craig died intestate and seized of an estate of inheritance in certain real estate described in the petition, situated in the city of St. Louis, which it is agreed by the parties has been correctly described. That upon one of said parcels of ground, being lot 24 of Nicholson Place, a deed of trust to secure the payment of a note for the sum of twenty-five hundred dollars was executed by the deceased, conveying the same to defendant Wade as trustee, and that defendant Bofinger was the owner and holder of said note. That said James Craig left as his sole heirs, the plaintiff, who is his lawful widow, and the defendant, William John Craig, his lawful child and the only issue of his marriage with plaintiff. That on or about the 8th day of May, 1897, the plaintiff elected to be endowed absolutely in a share of said parcels and tracts of land equal to the share of a child, as will appear from her election to be so endowed, absolutely, pursuant to sections 4523 and 4524 of the Revised Statutes of 1889, which election was duly filed for record in the recorder's office of the city of St. Louis, on May 14, 1897, and is recorded in book 1410, at page 7. That the parties hereto have title to said real estate as follows: The plaintiff is entitled to the one-half part of said estate; and the defendant, William John Craig, is entitled to and claims the other one-half part, but that the defendants, Mary Louise Craig and Emma Craig, also claim a life interest in the said property by virtue of the will of said James Craig, deceased, dated December 11, 1893,

and probated in the probate court of the city of St. Louis on April 5, 1897; and that defendant Wade is interested as such trustee, and defendant Bofinger as *cestui que trust;* and that by the provisions of said will the brothers and sisters of said deceased would be entitled to a remainder therein, contingent upon the death of said defendants, Mary Louise Craig and Emma Craig, without issue, but that plaintiff is unable to state whether or not any brothers or sisters of said James Craig are in being and, if dead, of whom their heirs consist, and, hence, she is unable to make them parties hereto, and that she does not know what interest said parties do or would have in the property aforesaid, and can not therefore enumerate the same.    Wherefore plaintiffs prays that partition of said real estate may be made between the parties plaintiff and defendant, according to their respective interests therein, and that if partition in kind can not be made without great prejudice to the owners, the said real estate may be ordered to be sold and the proceeds appropriated according to the respective rights and interest of the said parties. The said petition was filed June 11, 1897.

The original answer of Mary Louise and Emma Craig was filed June 16, 1897, and admitted that James Craig made his last will and testament and thereby bequeathed property to them, but denied every other allegation of the petition.

The amended answer of defendants, Mary Louise and Emma Craig, was filed on the 18th day of October, 1897, and is as follows:

"Now come Mary Louise Craig and Emma Craig, and by leave of court file this their separate amended answer to the amended petition, and state that it is true that James Craig made his last will and testament, and that it was admitted to probate on the 5th day of April, 1897. And further answering, these defendants deny the allegations of the amended petition, except as herein specifically admitted.

"And these defendants say that they admit that Craig was married to the plaintiff on or about the year 1833, at Garvagh, Ireland. And they further state that after said marriage said James Craig, with the knowledge and consent of the plaintiff, came to the United States of America, and made his home in St. Louis, Missouri. That after said separation between said James Craig and the plaintiff, the plaintiff, well knowing the home and place of abode of said James Craig, did voluntarily abandon and separate herself from him, and did refuse to live with him as his wife, to-wit, on or about the year 1836. That afterwards, in the year 1836, the plaintiff, well knowing the residence and abode of said James Craig to be in the city of St. Louis and State of Missouri, did come to the State of Pennsylvania, did thereafter continue to live in said State, well knowing the residence and abode of said James Craig to be St. Louis, Missouri, and did voluntarily live apart from, and separate herself from, said James Craig. That thereafter, the plaintiff, after such separation, and well knowing the residence of said James Craig to be St. Louis, Missouri, did voluntarily separate herself from said James Craig, and did intermarry with one Thomas Wilson, to-wit, at Philadelphia, on or about the year 1843, and thereafter with full knowledge that James Craig was residing at the city of St. Louis, unmarried, continued to live and cohabit with said Thomas Wilson as his wife and did bear children to him. And these defendants aver that by reason of the foregoing facts, the plaintiff forever forfeited all claim as the wife or widow of James Craig. And these defendants aver that James Craig, well knowing of the marriage of the plaintiff to said Wilson, did in the year 1856, thirteen years after the marriage of the plaintiff to said Wilson, lawfully marry the mother of these defendants, who were born of said marriage. And these defendants say by reason of the premises the plaintiff is not entitled to any interest whatever in the estate of

said James Craig, but is forever barred therefrom. Wherefore they pray judgment for their costs.''

The plaintiff's reply to said amended answer was filed on the 1st day of November, 1897, and is as follows:

''And now comes the said plaintiff and for her reply to the separate amended answer of the defendants, Mary Louise Craig and Emma Craig, herein, denies each and every allegation of new matter therein contained.

''And for further reply to the said separate amended answer plaintiff says that the said James Craig did against her objection, to-wit, about the year 1835, leave her in Ireland when her son, defendant William John Craig, was an infant about four months old, and while she was in delicate health, unable to endure the hardships of ocean travel and was advised by her attending physician that a journey across the ocean would imperil her life; and that he then promised to return to her or to send for her and not forsake her for more than two years; that said deceased thereupon came to the United States, and became a resident of the city of Philadelphia in the State of Pennsylvania, where he resided for about twelve months thereafter, and unmindful of his marital obligations to the plaintiff herein did then and there attempt to contract matrimony with one Miss Woodburn, and that because of his former marriage to plaintiff, then not nor never since dissolved, he was apprehended and fled to the State of Missouri, which was then difficult of access and could only be reached by river and overland by stage; that just prior to his leaving Philadelphia as aforesaid, he, by letter, informed plaintiff that he was 'going to the territories where no one could touch him;' that thereupon plaintiff continued to abide with her parents in Ireland, and did within a short time, to-wit, two years after the receipt of said information from said James, herself come to the

Vol 175 mo—24

United States, taking up her place of abode with one Robert Craig, a brother of said James, at Summit Hill and Philadelphia, Pennsylvania; that said James Craig well knew all the time that the plaintiff's place of abode was in said Philadelphia with his brother as aforesaid, but that he never communicated with her thereafter or in anywise apprised her of his desire to live with plaintiff again as her husband; that about the year 1840 the said James Craig went to said Philadelphia without plaintiff's knowledge; that he well knew at the time that plaintiff was then abiding in said Philadelphia or in its vicinity; that he then visited his said brother Robert, but that he did not in anywise communicate with plaintiff or attempt to do so, although she was easily accessible to him, and if he had indicated his desire at any time she would have readily lived with him as his wife as she was anxious to do, but that the said James Craig, after advising her of 'going to the territories' as aforesaid, never again communicated with plaintiff in anywise, although plaintiff did, about the year 1840, send a message to him at St. Louis, through friends, but from whom she never heard again; that plaintiff did not voluntarily live apart from and separate herself from said James Craig at all, but on the contrary, he did voluntarily abandon her, and refused and neglected ever again to live with plaintiff as her husband, and has never thereafter contributed in anywise to the support of herself and his child, the defendant William John Craig, but compelled her to accept support from her parents and his brother, said Robert, as well as to labor herself for her own support and that of his said child. That about the year 1843 the said Robert Craig informed plaintiff that his brother, the said James Craig, had departed this life, and advised her to marry one Thomas Wilson, whom she had known for about one year; that she thereupon consulted a council of clergymen of the Presbyterian church, whereof she was a member, who upon consultation advised her that

she was free before God and man to marry the said Wilson, and that she did thereupon marry him under the honest belief that her said husband, James Craig, was dead at the time, and that she was persuaded to do so in order to secure a home for herself and said child, because the said James Craig had refused and neglected to provide for her support in any manner whatsoever, and plaintiff says that she did not until after the birth of two children, as the issue of her marriage to said Wilson, to-wit, a period of three years after her said marriage, learn that said James Craig was not dead, and that she sometime thereafter was informed by said Robert Craig that he meant that the said James Craig was dead to her (the plaintiff) as he had another wife and family, viz., the said defendants, Mary Louise Craig and Emma Craig, and their mother. And plaintiff denies that said James Craig did marry the mother of the defendants Mary Louise Craig and Emma Craig, but, on the contrary, aver that said James Craig was in league with his said brother Robert Craig and was instrumental in having the false representations made to plaintiff as aforesaid concerning his death, and that he well knew that plaintiff was alive at the time of his marriage, but that he did not before, nor after her marriage to said Wilson, claim plaintiff as his wife; but did willfully and deliberately desert and abandon her. And plaintiff therefore says that she never abandoned said James Craig; that she married said Thomas Wilson without any wrongful intent on her part, and that she is by reason of the premises entitled to her share in the estate of said James Craig, deceased, by virtue of her said election, and again prays judgment as in her petition."

The other defendants have duly entered their appearance and answered, but said answers are not material to the main issues involved, as it is not denied that the deed of trust exists upon a part of the said property and is a prior lien to that of the other parties hereto.

It was agreed by both parties that the property in question was correctly described in the petition. It was further agreed between the parties that James Craig died on the 24th day of March, 1897, in the city of St. Louis, testate, and was seized at the time of his death of an estate of inheritance in the property described in the petition.

The entire bill of exceptions is not before us and we find that appellant has filed an abstract of the record, purporting to recite the evidence introduced in this cause, and also that respondents filed a statement of the evidence purporting to recite the evidence contained in the original bill of exceptions. As there are no objections indicated by the record before us, by either party, to the statements as to the evidence introduced, we will assume that the recitation by both parties of the testimony introduced, is correct.

The facts as indicated by the testimony contained in the abstract of the record as furnished by appellant, supplemented by the statements of the evidence as furnished by respondents, are as follows:

The plaintiff, Margaret Wilson, alias Craig, testified by deposition, taken on the 18th and 19th days of June, 1897, at Catasauqua, Lehigh county, Pennsylvania, which said deposition was filed October 1, 1897, as follows:

Direct Examination: "My name is Margaret Craig; have been going by the name of Wilson of late years; my maiden name was Margaret MacAlister; was born in suburbs of Garvagh, Ireland; my mother's name was Margaret MacAlister, and my father's name Anthony. The first time I was married to James Craig by a Reverend Dr. Brown, a Presbyterian clergyman, at the home of my parents in Garvagh, Ireland; there were present my husband's parents and mine, and my sisters and brothers younger than me; all children most; Daniel was there, but was a child, pretty near; they were all children much younger than me, many years;

Mrs. Swan was present; I was about twenty years old when I married James Craig; his age was something like mine; he was of age because he was free from his trade; he worked—veneering mahogany; we lived together as man and wife, of course, at my father's, at his father's sometimes; on account of my brother being ordained and getting a church and a parsonage I was to go and keep house for him; that is the reason we were not at housekeeping, waiting for that; we lived together as man and wife not quite two years.

"James Craig's father was John Craig, and his mother, Isabella; he had one sister, Ann, the oldest who was married to John McMullen; they lived in the suburbs of Garvagh; they had children, but don't know them; his business was a farmer. James Craig's father, John Craig, was a farmer. His other sisters were Nancy, who married Hugh McMullen, a brother of John McMullen; they had children, but I don't know them; they lived in the suburbs of Garvagh; he was also a farmer. Then he had a sister Mary, who married William Gilmore; I don't know whether they had any children or not. He had no other sisters that I know of. James Craig had brothers named Robert, William and John. Robert married my sister and came to this country, to Philadelphia. William married a Miss Gilmore in Ireland; I don't know whether they had any children. John Craig married a Miss McMullen; they had children, but I don't know how many. None of these brothers and sisters of James Craig came to this country besides Robert. I knew a Gilmore in this country, a cousin of James Craig, a tailor; he came to this country; I don't know his first name; I knew him, but I didn't know what he was; I heard he was dead; I saw him often at my own house in Philadelphia; that is a good many years ago; I am forty years in this town; I can not tell what year; it was over forty years ago; I heard of him, but I never heard anything in particular of him. I lived with my husband in Ireland not quite

two years; after that he left for America; the circumstances of his leaving were that I was not well; I was not in good health and my parents were not willing for me to leave; that was the most particular thing. Yes, Robert Craig had another daughter, named Margaret Lathrop, living in Philadelphia.

"Q. You say you were not well enough and strong enough to come to America with your husband? A. That was the objection of my parents.

"Q. That is the reason why you did not come with him? A. Yes.

"Q. Was that the only reason you did not accompany him? A. As far as I know, we were very good friends, sir; he making a good resolution to me when he was going away; in the same afternoon when he left, twelve o'clock at night, he asked me to come upstairs, and he would tell me what he would say to me if he would agree to come away without me, my parents not being willing to have me go (I suppose that I could have run away). Then I did not agree myself. Then I gave up to that I would come because they were so opposed to it. William John Craig, one of the parties to this suit, was a baby yet; he lay seven years awaiting for his papa to do something for him, and he got no support, nor hearing of anything coming. Every one said to me, no one will know you are married; the night before he left at twelve o'clock, he said, now Margaret, if you will agree for me to go away, I will tell you what I will say to you, if I can say anything about it; that he would tell me what he would say, and if you bring up your mother and aunts, the sisters, two aunts were there, to me, I will tell you what I will say: I will go to America with these young men, if I would say—that is what he wanted me to say—his wishes was that if I would say nothing about it, I will say to you if you say I can go on these terms; I will take my Lord, I will call the Lord my dying judge if I ever forsake you longer than two years, and my son; I will have you there independent of anybody.

"Q. And he left for America then? A. He left then; that was the last conversation; I was married, as near as I can remember, in the year 1832, and came to America in 1836; I brought my child William John with me; he is one of the parties to this suit; he was born in my father's house; the attending physician at the time of his birth was Dr. Kennan or Kernan. There were three physicians. That is why I was too weak to leave with him, my husband, for America. At my son William John's birth, besides the doctors, there was present an old lady they called the midwife. She was the only party, after all the three doctors held the consultation. Daniel MacAlister was there, but he was a boy; he knows nothing about it; those children know nothing about it; I landed in New York; there were nine of us together; cousins, uncles and aunts of his and his father's; the whole family. Samuel Craig and his wife come with him; an uncle and aunt of my husband came with us; from New York I went to Summit Hill, Pennsylvania; I stopped in New York about a week; at an aunt's named Cummins, my father's sister; remained there about two years in Summit Hill; I can not say exactly; I knew Miss Annie Smith and Miss Kate Smith at Summit Hill; got acquainted with them at Mauch Chunk a few miles on this side of Summit Hill, right after I came here; the Misses Anne and Kate Smith now live at Catasauqua; I was known at Summit Hill by the name of Margaret Craig, and my son, William John Craig; lived at Summit Hill not quite four years, then I went to Philadelphia and lived there about eighteen years, I think; I am not quite sure; from Philadelphia I went to Catasauqua, and have lived there ever since; forty years this fall, this is since 1857; while I lived in Philadelphia I knew Robert Craig, my husband's brother; I lived at his home; that is where my home was; I can not say exactly for what length of time; lived there till I went to the country and got married; that was my home; I was married the second time to Mr.

Wilson in 1843.   After my husband came to America
I got a couple of letters from him; I have not those let-
ters; I can not exactly tell what he said; the substance
is, as near as I can remember, about his time, what he
was doing, what he worked at, how he liked the place,
and all that, that was the first letter; the letters were
written from Philadelphia; then his next letter was that
he didn't like the answer he got; he sent a letter then
again saying that my proud father and proud brothers
might go to hell's fire, for he was going to the territories
where no one could touch him; and that ended all the
friendship with him and with us; that is the truth, and
I am going to tell nothing but what I know; I never
heard from him ever after that; there was no more cor-
respondence after that; I was advised then to stay at
my father's and wait seven years to see what would
turn up, and I waited seven years; when I got to Phila-
delphia I didn't get any letters from him; never a sen-
tence; he said he was going to the territories where no
one could touch him.

   ''Q.   Do you know why he went to the territories?
He was going to get married, and he was defeated there
then.

   ''Q.   Why was he defeated?   A.   Because they
were told that his wife and child were waiting at home
for him.   He left money on deposit there in the bank
when he left.   He did not take time to take the money.
I know Mr. Bacon well; he was treasurer for a deaf and
dumb asylum.

   ''Q.   Do you know if James Craig ever came to
Philadelphia while you lived there?   A.   I don't know
that; I never knew that; I don't know anything about
that.   It might be, but I don't know; I became acquainted
with Thomas Wilson about a year before I was married,
in Philadelphia; I think I was married under the name
of Craig.

   ''Q.   How did you come to marry your second hus-
band, Thomas Wilson; under what circumstances?   Just

state? A. He was intimate with Robert Craig, and Robert came with him from Philadelphia City on the old stage that was going between Bethlehem and the city, and traveled out here to a little village where William John was at school and I was at the time at Kreidersville, where William John was going to school.

"Q. And up came Thomas Wilson and Robert Craig, is that it? A. Yes, sir.

"Q. What was their object of that visit? A. The object of their visit was for Robert Craig to verify that his brother James was dead, and for me to agree to marry Thomas Wilson.

. "Q. What did Robert Craig say to you? At that place, what information did you get about him? A. He told me that James Craig was dead. That was the main thing of the visit.

"Q. What were the relations between Thomas Wilson and Robert Craig, were they friendly or otherwise? A. They were no relations, just friendly.

"Q. Did you on that representation marry Thomas Wilson? A. I did not say that time, but I said I would tell them after a little; I would have to see my ministers, one in Catasauqua and one in Mauch Chunk.

"Q. Did you see the ministers? A. I did, sir, and they all agreed together. I first found out that James Craig was not dead after I was married some time, I don't know how long; I can't say exactly how long it was after Robert Craig told me that; I don't know exactly when William John Craig first went to St. Louis; when he came back he gave me some information that was not favorable to him; he told me that he had his family there then; I said to Robert Craig one time after I was married, what made you tell me that story that James Craig was dead? Well, he said, he was dead to you, Margaret, because he has his wife and family; that is the way Robert explained why he told me that; I don't know whether my son William John Craig went out to St. Louis a second time; I can

not say for sure; he was out to his uncle's in Galena, Illinois; if I knew it at the time I can not say whether I knew it or not; I will say nothing but what I know; the Lord will know the rest; he will do the just thing; I never applied for a divorce against James Craig and was never divorced from him; no, sir; I waited all that time eleven years, before I was married; I never thought of such a thing. My son William John Craig went to Ireland twice; I can not say exactly when; I can not tell the dates.''

Cross-Examination: ''My present age is something over eighty-six; I don't know what year I was born; I don't know indeed that my age is less than ninety; I can not say; I would not be willing to say without I take time to look over some of my private records and little things. I don't know whether a marriage certificate was procured or not at the time of my marriage; don't remember that I ever saw one; I don't know that James Craig was six years younger than I; my brother Daniel might have been in the house when I was married, the children were all young then; Daniel might have been seven or eight years old or something; I can not say what his age is now; I can not come near to it. I did not preserve any of the family records of the Mac-Alisters; after my marriage to Mr. Craig we continued to live at my father's house till I came to America; Craig's father was just a short distance from my father's; I was as much there as I was at my father's, and so was the baby; we were just like one family, the two families; I think the date of my marriage to James Craig is 1832; I think it was in November; William John's birth was the 8th of January, 1834, I think, as near as I can say; James Craig's departure from Ireland was not quite two years after the marriage. Indeed I don't know how long Mr. Craig had been in America when I came over; William John was four months old when he came over, so you can take the date from that; I received two letters from James Craig

from Philadelphia; I did not preserve them; none from the territories; Rev. James Brown married us; I don't know whether they kept a record of marriages. The MacAlisters were Episcopalians. I never saw James Craig after he left Ireland; never saw or heard of him individually except those two letters; I came in company with an uncle's family when I came to America. They had a grown family. They went to live about New York some place; I left New York and came on to Summit Hill, and my brother and Robert Craig met me and took me up home; he met me on the way and took me to Summit Hill to his home and my sister's; that was my home until after I was married to Thomas Wilson. I think I landed in September, 1836; the first letter I received from James Craig after he left might be four or five months after he left; those were all sailing vessels, there were no steamers flying then; it took some time to go and come.

"Q. Did I understand you to say that in the last of these two letters—what was it that he said? A. I need not use any of the offensive language. I won't use the offensive language. It was pretty much offensive, but not to me; to my father and brothers. He called my father some things that were not nice. 'My proud father and proud brothers might go to hell's fire, for he was away to the territories and they could do nothing.' That was the substance of that letter. I have no more to tell about it. It was too much to tell now or any time.

"Q. He said nothing disagreeable to you in the letter? A. Not a word, sir; he had not aught against me. That is what he said concerning me. The cause of his feeling toward my father and brothers was because my father and family knew I was not fit to come to America at that time on account of my health and the boy being so young. And both his father and my father were willing to take care of us; but he was like the farmer's 'polly;' he got into bad com-

pany and he made his way to the territories; there was
nothing between my father and brothers and Mr. Craig
at the time he left Ireland; they never came in contact
in bad terms; he was not pleased that I couldn't go
along; there were no bad words between them, but their
feelings, perhaps, were not the best; it did not grow out
of the fact of my marriage; there were other arrange-
ments made for my husband, for me to go and live with
my brother, and th .t arrangement was broken up, and
that was all that was between them; I never heard any-
thing about any feeling on their part in regard to his
going to America; I don't know that his father and
mother agreed to his going; there was no expression of
ill feeling; I never heard anything that I could make
any remarks on; his father and mother were very re-
spectful to me, indeed, and all his family. Robert Craig
left Ireland before James Craig, many years before,
but he was home again; I knew the residence of Robert
Craig here to be at Summit Hill; I corresponded with
my sister, Mrs. Robert Craig; when James Craig came
here he stopped at Philadelphia as far as I was informed
by his letters; I don't know whether he had any other
relatives here; I did not know it; I don't know whether
he had a friend in St. Louis that I know of; I did not
know he had any; in late years he had a friend in St.
Louis, a cousin or something, but I don't know. I lived
in Summit Hill for three years; I went to my sister's;
that is all the home I had; I got to Summit Hill in Oc-
tober, 1836, and went from there to Philadelphia. I
never slept in a house in Philadelphia but my own, but
I went out occasionally during the day to do my fancy
work; I had to make my own living; after I became a
resident of Philadelphia, it might be two years, until I
married Mr. Wilson; I don't remember the date; you
gentlemen have a good education, good learning, but it
is a hard job for me; I don't remember the date of my
marriage to Mr. Wilson; I don't remember the year;
it was before 1850, it may be about the year 1840; Rob-

ert Craig continued to live in Philadelphia up to the time of his death; had his own home there; Robert Craig died a good many years after I married Wilson; I don't remember the year; I was married in Rev. Dr. Cooper's parlor; I don't know whether I had a certificate of marriage or not; all that were present at my marriage to Wilson are dead.

"Q. Do you remember the fact of the presence of James Craig in Philadelphia? Do you remember the fact that James Craig was in Philadelphia in 1841 or 1842. A. I don't think he was, sir; I don't remember the fact that he left twenty dollars for William John Craig, the boy; I remained on friendly terms with Robert Craig and wife during their lifetime; there was no ill-feeling between us; I visited their house as long as they continued to live; I went from here (Catasauqua) to Philadelphia frequently to see him; we lived fifteen years in Philadelphia before coming to Catasauqua after I married Thomas Wilson; at the time we moved to Catasauqua William John Craig lived there; I saw him frequently every day; I am quite sure I married Wilson in Craig's name; I am called that way in this town yet, Mrs. Craig. I remember when William John Craig went to St. Louis to see his father, but I don't remember the date; when he went there in 1855 he told me he saw James Craig, his father, and saw his family, both he supposed; he told me he saw his father but I don't remember about the family; the next time he went I think he saw his family; I knew in 1855 that James Craig was living; it was then that Robert Craig told me that he was dead to me; I knew some time before that he was living; I could not tell when I learned it.

"Q. Did you not know that James Craig was there in 1841 or 1842 and visited your sister's house, Robert Craig's, and left a small sum for this boy? A. I never knew that.

"Q. You never knew that? A. I never knew that, never; there is no deception in my saying that; I

never knew it; never knew he was there, about the money, nor never knew he got that; I was kept in the dark about that; I can not tell exactly when I knew that James Craig was living in St. Louis; I heard he was living there before I came to this country; I don't know whether James corresponded with his brother, Robert; I never knew that he did, I can not say; I heard it in current news that he was there.

"Q. Knowing that James Craig was living, how did you understand that you could marry Thomas Wilson without a divorce? A. I did not think of such a thing, nor could not imagine, nor did not understand; perhaps I was too ignorant to understand that; but the council that met together of the most respectable clergy and doctors of divinity held a council over it, and I was advised by all of my friends that I was free from both God and man from the treatment I got. And any well educated man that has a good education can see that in that I was not well treated. I never told my son John that I was divorced.

"Q. Did you understand how it would affect your children by marrying a man when you had a living husband undivorced?

"Objected to as calling for a question of law.

"A. He was a dead husband to me. The doctor of divinity from Belfast said if I was seven years without his support, and had to support the child and all that I was free by the laws of the nation to get married. Then I lived that seven years and took care of my boy and worked for them; then there was no word of his doing anything; then I lived eleven years altogether without getting married. I was free before God and man for getting a home to myself. As soon as I got married I got a decent home, and my husband told me to get William John Craig and take care of him. Before I left Ireland I had a talk with this Belfast man, and he told me that if I lived seven years without marrying, and without support, I was free from him. He

consulted me about Mr. James Craig's leaving me. This divine from Belfast was Dr. Cooke, the head professor of the college, the Belfast Presbyterian College.

"Q. Then before you left Ireland you had consulted about the abandonment and separation from your husband, Mr. Craig? A. Yes, sir, because he had done it himself; because he ran away and went to the territories, he said, where nobody could touch him. I have had children by Mr. Wilson—four of them living. William John Craig was the only child I had by James Craig.

"Q. What was it that Robert Craig told you before you were married? A. He told me that he was dead.

"Q. You knew he was not dead? A. I did not, sir. Oh, no, I did not know he was not dead; I was corresponding with the family; I was out here in the country the time Robert Craig came to tell me; I did not know whether he was dead or not; I can not say anything I don't know; I was out visiting William John Craig in the country; Robert Craig came out to see me on a visit; he had Thomas Wilson along with him; I can mind that. Then he came to verify that James Craig was dead. After I was married, in my house in Philadelphia, the next house to theirs, I was out every evening; up to death we were always together. I asked him what made him tell me the story; he said, he was dead to me, for he had a wife and family; I knew nothing coming from St. Louis except what came through him, Robert Craig. They came there and made a visit there at Kreidersville, which is from here about two or three miles—Bath is a few more miles, and there my minister lived, Rev. Irvin. Then I said when they asked me some more questions after they told me this time that James Craig was dead. They stopped over night at the old gent's house, and the next day the two traveled from Kreidersville over to Bath, about four or five miles, and went to see my minister. I said I must see Irvin, and

must see Webster at Mauch Chunk—I went four years to his church. I said, I can not give you any definite answer on the question you are asking until I see both of these two men, they were both my ministers, the one here and the other in Mauch Chunk. They went over to Irvin, these two men, Robert Craig and Wilson, and Irvin went with them to Mauch Chunk and saw Webster and got his letter for me; I think another gentleman was taken in the church at Mauch Chunk, and they all met and had a council and they all advised me to embrace my opportunity, I was free before God and man. And then I lived a good many years before I got married. So that I did not do it without counsel and I was well advised.

"Q. How long after Robert Craig told you this story was it till you learned that James Craig instead of being dead was alive? A. Not till after I was married; and when I was married and had my second child I found out that first; then I said to Robert Craig, what made you tell me that story when I was at Kreidersville? A. He said, I told you no story, because James Craig was dead to you, for he had a wife and family; I learned some time after 1845 that James Craig was not dead.

"Q. Of course, when you reproached Robert Craig about telling you this story you then had learned that he was living in St. Louis? A. Yes, sir, and long before; and that was his answer, he was dead to me; during all these years I remembered what he said the day before he left for America, that God would be his dying judge if he would forsake me more than two years; he said that the night before he left; I made no inquiry as long as he was happy with his family; I had no right to write to him; I never made any complaints on him nor never made any inquiry about him; I was advised by that council that I was free from him.

"Q. You were advised that way again? A. I was so, conscientiously; I hope you believe me, because

my friends are almost all dead; it is very hard for me to remember it exactly, for me to work for my living till my child should come of age without any support from nobody; I think I did say he left his money in the bank in Philadelphia; he left in a hurry; a strange man came to the bank to get the money and they sent for Robert Craig to verify his brother that came from St. Louis, and when Robert Craig could not verify the strange man that came to take the money, he did not come back himself; if it had not been for me, that man would have gone, where he would not have gone, home in a hurry, but I would have nothing to do with it; that man was not him, it was a strange man and he could not get the money; the authorities at the bank sent for Robert Craig to identify the man as his brother; they kept him at the bank till Robert came, but he did not get the money; I knew through the bank that was James Craig's money; I was so informed; I can not say how long before my marriage this was."

Re-direct examination: "I am not sure as to my age; I kept no family Bible where I kept the date of births; I never had it myself, I don't know how old Daniel was; all my family were there. James Craig has never contributed one dollar to my support since he left Ireland. He never sent me any money to Ireland in these two letters. I consulted this minister, Dr. Cooke, after I received the letter from James Craig, my husband, that he was going to the territories. That is the only minister I consulted over there. There was no council of ministers over there; the council I speak of was here, when Robert Craig and Wilson came to Kreidersville. My father was an architect; James Craig's father was a farmer. Originally I came to America to make a visit of a year. After he wrote this letter about my father and brothers it did not make any difference to me, but my father showed that to Dr. Cooke, and that was when Dr. Cooke gave this advice.

Vol 175 mo—25

I answered the first letter but did not answer the second. When I came to Philadelphia I worked for a living with my needle until I earned my living. William John Craig during this time was at Kreidersville for six years at school. He worked with a doctor and drove out with him sometimes. I am one of the plaintiffs and William John Craig is one of the parties also. The reason he felt that way toward my brothers and parents was because I was to go to my brother, the minister, to live. I corresponded with my sister, Mrs. Robert Craig, and she wrote me to come here to see them; I was very delicate and my father agreed to give me money if I would come in a year and make a year's visit and keep the child home. That is the truth. Instead of staying a year I stayed sixty years. My father gave me plenty of money to bring me back. Robert Craig, when he told me that James Craig was dead, spoke seriously. All that information I placed before these divines and that council decided that I was entitled to marry. I was not obliged to do it but I was advised to do so. If James Craig was in Philadelphia at the bank to get this money, I don't know anything about it. I knew about that man being there. The only way that I know of that is that Robert Craig was sent for to identify the man at the bank. It was not his brother James; it was a strange man. I was told afterwards that James Craig came and got his money. I never knew anything about his leaving $20 for William John. I did not know before I came here to this country that James Craig was in St. Louis. I meant by that that he had gone to the territories. It is a long journey between here and there; I did not know at the time I left Ireland where he was, only he was in the territories. I did not know it was St. Louis nor did my family. When I married Thomas Wilson I had to take Robert Craig's word for it that James Craig was dead, and I thought he was dead. I heard nothing from James Craig in St. Louis; all I heard was from Robert; Robert Craig was very

kind; he was a father to me; he was a great deal older than James.

"Q. You had heard as well as anything you did not see that he was a resident of St. Louis at the time you came to this country? A. Yes, sir.

"Q. You knew that fact all the time? A. Yes, I knew that all the time.

"Q. You knew that when you married Thomas Wilson? A. Yes, I did.

"Q. You knew that James Craig was living in St. Louis when you married Thomas Wilson? A. Yes, sir; and had his family; that is what I understood.

"Q. You knew the fact of his living there? A. Yes, sir; of living there with his family. [James Craig did not marry until May 20, 1856.]

"Q. Knowing that James Craig was living, how did you understand that you could marry Thomas Wilson while he was living and without a divorce? A. I did not think of such a thing, nor could not imagine, nor did not understand that, but the council that met together of the most respectable clergy and doctors of divinity held a council over it, and I was advised by all my friends that I was free from both God and man from the treatment I got. And any well-educated man who has a good education can see that in that I was not well treated.

"Q. Did you make known to the minister, Dr. Cooper, in whose parlor you say you were married, the fact that this undivorced husband of your was living? A. I don't know; I suppose he did not ask me any questions about it.

"Q. Did you tell Dr. Cooper that you were a married woman and that you were undivorced? A. I did not. No, sir; I did not. My husband, Thomas Wilson, was a member of his church, and very intimate with him. I don't know what passed between them. It was all known to him.

"Q. You say you told your husband, Thomas Wilson, that you had not been divorced from James Craig? A. He knew all about it.

"Q. I asked you whether you told him? A. He knew I was not divorced from him.

"Q. Did you understand how it would affect your children by marrying, when you had a living husband undivorced? A. He was a dead husband to me. The doctor of divinity from Belfast said if I was seven years without his support, and had to support the child, and all that, I was free by the laws of the nation to get married, etc.

"Q. Then it made no difference to you, so far as your conscience was concerned, so far as you understood your relations before the law, it made no difference to you, whether James Craig was living or dead? A. No, sir.

"Q. There was something said by you, as I remember it, about Craig's leaving Philadelphia and leaving his money in bank? A. I suspect I did say it, because he did. Yes, sir; he left his money, for he went off in a hurry.

"Q. Do you remember when that was? A. Not exactly, sir.

"Q. With reference to the time that you came to this country, when was it? After you moved to Philadelphia, or before? A. It was after we moved to Philadelphia, because Robert Craig was living at Philadelphia—being sent for to come to the bank to verify his brother that came from St. Louis. I was sent for to see whether I would accept of that money. It was $600. I told him I did not want it and did not accept it.

"Q. Did he send you any money to Ireland in those two letters? A. No, not to me; maybe to that boy; I don't know.

"Q. Did he ever send any money? A. I believe he did; his father got some money.

"Q. What was James Craig's father's business?

A. A farmer. He was comfortably fixed. Originally I came to America to visit for a year. Never to look for him.

"Q. You, of course, after he wrote this letter about your father and your brothers, you did not feel very friendly on that account? A. It made no difference to me, but my father showed that to Dr. Cooke.

"Q. And that was when Dr. Cooke gave this advice? A. Yes.

"Q. Did you answer the letters that he wrote you? A. I never answered that.

"Q. Did you answer the first letter? A. Yes, sir; the first letter.

"Q. The second letter you did not answer? A. Oh, no, sir; that was all. I was asked at home, whenever you need money tell it, so I was not much troubled.

"Q. Mr. Taylor, you say, had in answer to a question of his, that you had known all the time, all these years, that Mr. Craig was alive at the time or just before the time you married Mr. Wilson, after Thomas Wilson and Mr. Robert Craig told you that he was dead, did you at that time believe that he was alive? A. I don't know whether I believed it or not. I had a ticket for belief.

"Q. You did not know at the time you left Ireland that he was at St. Louis or where he was? A. Yes, sir."

The plaintiff being recalled on the 14th day of October, 1897, in the city of Worcester, Massachusetts (depositions filed October 1, 1897), testified:

Direct examination: "At the time my husband was in Philadelphia for that money, I did not know that he was there at the time. I first learned from some of his brother's family that he had been there; not very long thereafter. I slept at Robert Craig's house every night while living in Philadelphia excepting a few nights when I would be doing some work for a respectable family by the name of Bacon. I was at home dur-

ing the day while I lived at Robert Craig's except when I was working out. Yes, I spent a few Sundays at Mr. Bacon's; I was away often from Philadelphia after I moved there to live with Robert Craig, going to Kreidersville, where William John was. I would stay at Kreidersville on these visits several weeks, some times a month. James Craig made no effort to see me when he was in Philadelphia for the money. At the time if I had known that he was in Philadelphia I think I would have made an effort to see him, but I didn't know it. If he had made any effort to see me, he could have found me at the time he was said to be in Philadelphia. He could have found me easy. William John Craig was born after my marriage with James Craig, certainly, James Craig never denied his paternity of my son, William John, and recognized him as his son. I was a Protestant at the time I married James Craig. I was a member of the Presbyterian church. I was what was then known as a Dissenter. I was never a member of the Church of Ireland. The reply that I wrote James Craig to his first letter was a pleasant letter. He said in that letter that if he would like the country, in two years he would have me and his son with him. The reason that I did not answer the second letter was because he said he had gone to the territories. I would have gone with him and lived with him if he had sent for me or had written me to come to him, or asked me to live with him again as his wife. No, sir; I would not have married Mr. Wilson if I had not been informed by Robert Craig that James Craig, my first husband, was dead. I believed he was dead, when I married Mr. Wilson, for his own brother told it to me. Mr. Wilson died the last of October, 1870. I can not say from whom I first learned that James Craig was not dead. I was out in Galena, Illinois, as I testified, with my daughter, now Mrs. Thomas, about 1870. James Craig never entered a suit against me for divorce in Pennsylvania, or any other place. After my marriage to Mr. Wilson, he and I sup-

ported William John Craig, my son. The reason that I was too weak to leave with James Craig for America was that the doctors forbid me going; that I was in bad health; that I was not fit to go; that I might never see the other side if I went. At that time, it took a vessel nine weeks to come over. The evening just before James Craig left, he called me up stairs, and asked if I wouldn't agree to let him go with the company. I objected, and then he said that if I wished him good luck, he would not forsake me more than two years. And he lifted his hand, and he said, 'If I ever forsake you more than two years, I will call the Lord to be my dying judge.' What I meant in my cross-examination, that Mr. Craig was about to be married, and that is why he went to the territories, was that he intended to marry a Miss Woodburn, and a servant told of him that he had a wife and child at home, and it was made public, and he had to leave. When I stated in my cross-examination in answer to a question of Mr. Taylor that I knew Mr. James Craig, my first husband, was living when I married Mr. Wilson, and that he had his family, I meant by that, that I knew that afterwards. I did not know that he was alive at the time I married Thomas Wilson. I sign my name both Margaret Craig and Margaret Wilson.''

*William John Craig,* in behalf of plaintiff, testified (depositions filed October 1, 1897):

''I live at Catasauqua; I have lived here forty-four years. My first recollection of my existence as a child was at Summit Hill; I was between four and five years old at my first recollection; I lived at Summit Hill with my mother. She lived with her brother a while and also with a Mr. McLann. Lived there as near as I can remember until I was between six and seven years old; went from there to Northampton county, about five miles from here, I suppose; then went to Kreidersville post-office and stayed there till April, 1847; went from there

to Philadelphia; stayed there until 1850, and from there to Baltimore, and stayed in Baltimore until late in the fall of 1853; then came back to Philadelphia and stayed there till 1854; then I went from there to Ireland and stayed there about five months; then came back to Philadelphia and stayed a few months and then took a trip to St. Louis. Stayed there about four weeks, then came back to Philadelphia; stayed about eight or nine months and then came to Catasauqua and have lived here ever since. My first occupation was working on a farm five miles from here. When I was a boy my mother was known as Margaret Craig. I became well acquainted with Robert Craig and his family. The first I learned of my father was through Robert Craig's family. I learned that he had been in Philadelphia and left me twenty dollars with Robert Craig; that was along about 1843 or 1844, or perhaps a little before that; I can not tell exactly. I learned he was in St. Louis. I don't know whether Robert Craig corresponded with him or not. I never saw any letters. My first recollection of seeing my father was in 1855, in St. Louis. Saw him at Second and Chestnut streets. He was manufacturing furniture. I was introduced to him by Mr. John Gilmore, a cousin of his own. He was in the clothing business, a tailor. The object of my visit to St. Louis was to have my father give me a start in business. I stayed between three and four weeks. He recognized me and introduced me as his son, but gave me no money to start in business. He promised to give me some; he promised to give me five hundred dollars, but he did not do it. He promised to send me a draft. My father was not married at that time. He spoke of my mother and wondered how she was getting along, and asked about the relations in Philadelphia, about his sister, Mrs. McMullen, and his brother, Robert. Then I came back east. When I came back from St. Louis I came to Catasauqua. He did not send me any money. The next time I saw him was in 1856 in St. Louis, at the same place and same bus-

iness. I wanted to know why he did not send me the money, and he said he had no money to spare now. He never spoke to me about his relations on that occasion. I staid perhaps five or six days. I saw his wife on that second occasion at her house. He lived five or six blocks from the store. I had a talk with his wife. I asked her if she knew that my father had been married before and she said that she had not known it; said if she had known it her marriage would not stand in the church; that she was married in a Catholic church and it would not stand; she said she did not think he had been married. I came back east again; did not hear from him for six or seven years after that; received information from a gentleman named Dempsey that he was still in business; after that I didn't hear much of him until I got the information from Mr. McIntire, about five years ago, that he was still living; I saw Daniel MacAlister the 10th of last June; I went to Ireland the first time in 1854; visited my father's relations; they received me very nicely; treated me as a full-blood relative. I saw my uncles John and William Craig; I staid in Ireland about five or six months; I came back and went to Philadelphia; went back to Ireland again in 1870 with my wife. I did not learn from any one that my father had ever applied for a divorce. When I was in St. Louis the latter part of April last I called on the defendants, Mary Louise and Emma Craig, but never got to see them until afterwards when I saw them in court. They declined to see me at their house. The statement in a letter to Mary Louise and Emma Craig that my father had been divorced was not true; I was under the impression that it was so. She did not tell me that or any one else."

Cross-examination: "My age is sixty-five; when my mother left to reside in Philadelphia I was between six and seven. She went to Philadelphia about 1840 or 1841, to the best of my recollection. My recollection of my birth is 1835. I think the visit of James Craig to

Philadelphia when he left the twenty dollars was in the fall of 1843 or '44. I did not derive the information about his leaving the twenty dollars from my mother but from my uncle Robert. I don't think my mother knew that my father was in Philadelphia and left this twenty dollars. She did not say so; I got the information from my uncle. I told my mother afterwards that I got the money from my father, at least that is what my uncle Robert said, but I did not see my father. I heard then that my father was in St. Louis. I had an idea that he was there but I was not just certain of it. The way I knew it when I went to see him was I heard it from a cousin of mine. I think the marriage between my mother and Wilson took place along about '43 or '44. I told my mother when I returned from St. Louis that I had seen him. The impression that I got about the divorce was that such a thing must have been when they got the second marriage. I wrote my father one or two letters after I arrived to manhood. Did not write to him before I went to St. Louis. I don't know whether his sister, Mrs. McMullen, corresponded with him. I was not present at the marriage of my mother with Wilson. I was then living at Kreidersville. I lived with her from 1847 to 1850 after her second marriage. Don't remember to whom my father introduced me in St. Louis. He asked me about my mother's marriage. There was nothing said between my father and me about a divorce. I can not say whether he was there before the marriage of my mother with Wilson. I was quite young. It was along there in these years, 1844 and '45, and it may have been 1843; I have no means of fixing the date. I can not exactly fix it. I think my mother was making her home with Mr. Bacon about that time, sewing there. She sewed some for Mr. Bacon after she was married. I think it was before her marriage that I received this money. That is my best recollection."

Redirect examination: "She spoke of her marriage to her first husband frequently; and would say dif-

ferent things; she was sorry the thing happened so. When I received that money it must have been along from 1841 to 1845. They did not know exactly where he was when I was in Ireland. After he settled in St. Louis he did not keep up in his connection with his family. Family all treated me as a relative. My mother sewed and slept at Mr. Bacon's sometimes. I heard Mr. Gilmore, a cousin in St. Louis, was killed in the rebellion in St. Louis. Yes, my daughter, Mrs. Prescott, was visiting in Ireland. I know Miss Anna Smith and Miss Kate Smith; my first recollection of them was in Mauch Chunk, Pennsylvania; I was then about five or six years old.''

Recross-Examination: ''I think that my best recollection is that my father was in Philadelphia and left the money before my mother married Wilson.''

*Margaret Ann Lathrop* (deposition filed October 18, 1897) testified:

Direct examination: ''I am a sister of Sarah Craig. My father was Robert Craig. He had brothers, James, John and William. James lived in St. Louis as long as I can remember, ever since he left Philadelphia. He came to my father's house at the homestead down on the river front. From there he went to St. Louis and lived there up to the time of his death so far as I know. I kept up a correspondence with him I guess about two years after he left. That continued until 1858. My age is now sixty-three. I got married and went to live at Mauch Chunk and that is when the correspondence stopped. I have none of the letters. Had a letter from him about the time he was married. He wanted me to come to St. Louis on my wedding trip. I addressed my letters to St. Louis, I don't remember the street. I remember his coming here from St. Louis after he had gone there. I can not just remember the occasion of his coming. I can not make up my mind whether it was the time he came out to take the money—some man had come

to draw money—whether that was the first time or whether it was the second time. I guess he was just here once; it was on a Sunday that I remember seeing him the most. I saw him here at the homestead. There was a man here that wanted to draw his money out of the bank and my father said it was not his brother. He came on after that to draw the money. I did not see him at the time. He stopped at my father's house. Mrs. Wilson was not then married. That is my recollection about it, that she was not married. I can not remember whether Mrs. Wilson, his first wife, saw him. He gave me a token of remembrance, $25 and a gold pencil (the gold pencil being attached to the deposition and marked as an exhibit). I do not remember that my father kept up any correspondence with his brother James. When my father and mother lived at Summit Hill is my first remembrance of James Craig's first wife, Margaret. I knew her son, William John, one of the parties to this suit, and he was there with her at the time. My father got her and brought her to the house when she came to this country. She was never divorced from James Craig. I remember William John Craig going to St. Louis to see his father. I heard the history of the marriage with Mrs. Wilson talked of either by her or the family. He did not do anything for her and she was alone, working. Uncle Thomas, Mr. Wilson, boarded at my mother's and father's at the time; that is all I know about it. William John went out to see his father way back in 1855."

Cross-examination: "Mrs. Wilson lived in my father's family up to the time of her marriage; I was not receiving letters from James Craig at that time; I was too young; it was known that he lived in St. Louis at the time of Mrs. Wilson's residence with my father."

(Plaintiff admits that James Craig always lived in St. Louis from the time he left Philadelphia to the day of his death and never left the place.)

"I was a little girl at the time James Craig visited

Philadelphia and gave me the twenty-five dollars and the gold pencil; about ten or twelve years old I should say; all who were at the house at that time have passed away; the pencil was given to me just before I was married in 1858; the twenty-five dollars was given to me the first time, when I was a little girl; I don't think Thomas Wilson was married to Margaret at that time. According to my best recollection, Margaret was not married to Thomas Wilson at the time he gave me the $25; I can not remember whether I was present at the marriage of Margaret with Thomas Wilson; they continued to reside with my father after they were married for some time; I can not remember how long they resided there; she never said anything about her marrying Wilson because James Craig did not do anything for her. Never heard her give any reason. You will have to excuse me for I have been all through this myself; I had a husband who sued me for divorce and took me through the courts and I gained the victory; I am his wife while he lives but this confuses my mind and I can not answer correctly. Kind of bothers me. I think after the marriage Aunt Margaret and Wilson went right into their own home; I think they went right into their own home. I don't remember ever having any conversation with her about the reasons she married Thomas Wilson.''

*Sarah Craig,* a daughter of Robert Craig, with whom plaintiff lived from the time she came to America, up to the time of her marriage with Wilson, testifies in answer to Mr. Ottofy:

''Q. Do you know what business he has been in out at St. Louis? A. The furniture business.

''Q. Was his residence ever known as any other place than St. Louis? A. Not to my knowledge, no, sir.''

Again:

''Q. Do you know Anthony MacAlister? A. Yes, sir, he was my uncle.

''Q. Did you ever hear him speak of Mr. James

Craig? A. I have heard him here say, when he came to see mother, that he stopped in to see him when in St. Louis."

Plaintiff offered in evidence the will of James Craig, duly admitted to probate in the probate court for the city of St. Louis, April 5, 1897, in words and figures as follows:

"In the name of God Amen. I, the undersigned, James Craig, widower, of the city of St. Louis, do make, publish and declare the following to be my last will and testament, hereby revoking and annulling all former wills and codicils by me made, subject to the payment of my just debts and the expenses of my funeral. I dispose of my entire estate in the following manner, to-wit:

"I give and bequeath the sum of one dollar and no more to my son, William John Craig.

"I give and bequeath my personal estate, share and share alike, to my two daughters, Mary Louise and Emma Craig.

"I give and devise my real estate wherever situated, in equal shares to my said two daughters, Mary Louise and Emma Craig, for and during their natural life. On the death of any one of them, I devise half of my said real estate absolutely to the child or children left by her; should, however, such daughter of mine die without leaving issue then all of my said real estate shall go to my surviving daughter for and during her natural life, and upon the death of such surviving daughter of mine to her child or children absolutely. Should further such surviving daughter of mine also die without leaving issue, then all my aforesaid real estate shall go in equal shares to my brothers and sisters or their legal representatives.

"The foregoing devise to my daughters shall be conditioned that they or their survivors shall annually expend $20 for keeping in order my burial lot in Calvary Cemetery, St. Louis, Missouri.

"Finally, I appoint my said daughters executors of this, my last will and testament, without being required to give bond for the administration of my estate. In witness whereof, I have hereunto set my hand at the city of St. Louis, Missouri, this 11th day of December, 1893.

"JAMES CRAIG."

Plaintiff's counsel next offered in evidence the election of Margaret Wilson, alias Craig, widow of said James Craig, to take a child's part in lieu of her dower, which was shown to be duly recorded in the recorder's office of the city of St. Louis, Missouri, May 14, 1897, and in probate court of the city of St. Louis, May 26, 1897, and which is as follows:

"In the probate court of the city of St. Louis, State of Missouri, in the matter of James Craig, deceased, No. 22951.

"State of Missouri, city of St. Louis—ss.

"Know all men by these presents, that I, Margaret Wilson, alias Craig, of the city of Catasauqua, county of Lehigh, State of Pennsylvania, the lawful widow of James Craig, deceased, late of the city of St. Louis, Missouri, by whom I have but one child living, namely, William John Craig, do in lieu of dower of the one-third part of all lands whereof my said husband died, seized of an estate of inheritance, hereby elect to be endowed absolutely in a share of such lands equal to the share of said child of my said deceased husband, pursuant to sections 4523 and 4524 of the Revised Statutes of the State of Missouri, hereby intending to elect to be endowed absolutely in both the lands and personal estate of said deceased in a share equal to the share of a child of said deceased, namely, net one-half of all of said estate.

"MARGARET WILSON, alias Craig.

"State of Pennsylvania, county of Lehigh—ss.

"On this, 8th day of May, 1897, before me personally appeared Margaret Wilson, alias Craig, to me known to be the person described in and who executed

the foregoing instrument and acknowledged that she executed the same as her free act and deed. In testimony whereof, I have hereunto set my hand and seal at my office in Lehigh county, Pennsylvania, the day and year first above written.                   "A. M. ULRICH.

"Justice of the Peace."

It is admitted between the parties that James Craig died seized of an estate of inheritance in fee simple in the property described in the petition and that it is worth the sum of $22,000.

It is also admitted that there is a deed of trust on a part of this real estate as described in the petition.

This was substantially the testimony upon which this cause was submitted to the court. At least, it is a sufficient recitation of the testimony, upon the only controverted question in this cause, to intelligently discuss the errors complained of by the appellant.

The court made its finding upon the issues for the defendants and dismissed plaintiff's petition and from this judgment the cause is by appeal presented to this court for determination.

This is an action on the part of plaintiffs for partition, and there is but one question to be determined in this controversy: Was the testimony introduced in this cause sufficient to bar the recovery by plaintiff, Mrs. Wilson, of her alleged interests in the lands of the deceased James Craig?

The defense to her right of action in this case is fully set forth in the answer of respondents, and is based upon the provisions of section 4532, Revised Statutes 1889, which provides: "If a wife voluntarily leave her husband and go away and continue with an adulterer, or, after being ravished, consent to the ravisher, she will be forever barred from having her jointure or dower, unless her husband be voluntarily reconciled to her, and suffer her to dwell with him."

It will be observed that this statute was enacted for

a wise and wholesome purpose; it was intended to announce a principle of sound morality and public policy. The court, in the case of Hoyt v. Davis, 21 Mo. App. 235, very appropriately announces the purpose and object of this statute. It said: ''That principle is that the wife, who wholly repudiates her marital obligations by abandoning her husband and living with an adulterer, and who is not subsequently received back by him, forfeits thereby all right and interest in his estate after death, of whatever description, which the law vests in her in her character of wife. She can not repudiate, while her husband lives, all the obligations of the marital relations, and take all benefits which remain after he dies.''

The question, and the only question with which we have to deal, in this case, is the application of the facts to the true spirit and meaning of this statute. As to the construction of this statute, and the facts to be shown in order to fall within its provisions, we are of the opinion that the American courts are practically harmonious.

The terms of this statute, ''If a wife voluntarily leave her husband and go away,'' have been the subject of much discussion by the courts of this State, as well as other jurisdictions. We deduce the true rule, from the best-considered cases upon this subject, to be, that it is not necessary that there should be any special form adopted in the leaving and separation; but any separation, which is demonstrated by her acts and conduct to be voluntary, and which is not brought about by the acts of the husband, or by any restraint upon her person, fully meets the provision that she must voluntarily leave her husband.

The leading case in this State discussing the application of this statute in respect to the bar of the interest of the wife in the lands of her deceased husband, is the case of McAlister v. Novenger, 54 Mo. 251. It reviews all the authorities on the subject, and finally announces

Vol 175 mo—26

this doctrine, which we think is in perfect harmony with the moral principle sought to be preserved by the statute. The court says: "Adultery is the main offense which causes the forfeiture. From motives of policy the law has deemed it wise to restrict the forfeiture to cases where the wife lived separate and apart from her husband. It is manifestly wise, if the husband and wife continue to live together till the death of the husband, to let the scene close with his death and to preclude the heir from making inquiry as to the conduct of the wife when the ancestor had not complained. But when a separation takes place by mutual consent, or the wife willingly and voluntarily lives apart from her husband, and afterwards lives in adultery, and no subsequent reconciliation takes place, both reason and authority concur in holding that she is barred from claiming dower in her deceased husband's estate."

The case of Payne v. Dotson, 81 Mo. 145, cited and earnestly relied upon by appellants, does not in any way conflict with the McAlister case, supra; it quotes approvingly that case. It simply uses the terms of the statute, and announces that the separation and leaving of the wife must be her voluntary act. This is true; but these requirements of the statute need not necessarily be shown by any particular form of voluntarily taking leave of her husband; but if such requirements do not concur in form, but do in substance, it is within the spirit and meaning of that statute.

This principle is clearly announced and conceded by one of the ablest jurists this nation ever produced. Chief Justice MARSHALL, in the case of Stegall v. Stegall, 2 Brock. 256, in speaking upon practically the same provisions as appear in our statute, says: "The words of the act of Assembly are: 'But if a wife willingly leave her husband, and go away and continue with her adulterer, she shall be barred forever of action to demand her dower, that she ought to have of her husband's lands, if she be convicted thereupon, except,' etc. [1

Rev. Code of 1819, ch. 107, sec. 10, p. 404.]   So far as respects that part of the provision which relates to the wife's willingly leaving her husband, I think it is satisfied by any separation which is voluntary on her part; and I think any separation voluntary which is not brought about by his act or by any restraint on her person.  In this case, it does not appear that her person was restrained, and the authority of her parents ceased on her marriage.   Her husband wished her to accompany him, and she refused.   The separation must, therefore, be considered as voluntary on her part.   The report that he was married with another woman does not justify her refusal to accompany him, because it was not true, in fact, and she ought not to have acted upon it.  But if his real situation was such as to justify separation, it could not justify her subsequent conduct.   That was incompatible with the continuance of her claims on him as a husband.''

We take it that the rule is well and correctly settled in this State as to the construction of the statute under discussion; it only remains to apply the facts as indicated by the testimony introduced in this cause.

The only controverted issue in this case is one of fact.   It is needless to cite authorities upon the well-settled practice of this court, that, in reviewing the action of the trial court upon its findings upon pure questions of fact, this court will defer to the result of the findings of the trial court.   [Taylor v. Crockett, 123 Mo. 300.]

We shall not undertake to discuss in detail the evidence as applicable to the only issue in this cause.   We have quoted, substantially, the evidence pertinent to this issue, as furnished by the statements of counsel for both appellants and respondents.   In respect to that testimony, we are of the opinion, after a careful consideration of it, that it is sufficient to support the finding of the trial court.

It appears that James Craig and the present plain-

tiff, Mrs. Wilson, were married in Ireland nearly seventy years ago. He desired to come to America. Nothing is disclosed that up to the time of his leaving Ireland, there was any trouble between them as man and wife. He tried to have her accompany him; she declined on account of ill health. His leaving Ireland, as disclosed by the evidence, was not an abandonment; this is made evident by his writing her very kindly, after reaching this country. He wrote her two letters; these letters are not in evidence, but Mrs. Wilson admits that so far as they related to her, they were kind and appropriate from a husband to a wife. The second letter made some rude reference to her parents. This letter was discussed. She never responded to it. James Craig finally took up his abode in St. Louis. In 1836, Mrs. Wilson, then the wife of James Craig, reached this country, and for a number of years her principal stopping place was at the home of Robert Craig, in Pennsylvania. The testimony of Mrs. Wilson indicates clearly that, after the receipt of that second letter, she never intended to live with James Craig as her husband. This clearly appears from her testimony in chief, and is emphasized by her testimony upon cross-examination. No one can read the testimony in this case and reach any other conclusion than that Mrs. Wilson-Craig knew the residence of her husband James Craig, and, while we do not fully commend the conduct of James Craig, had she sincerely wanted to resume her relations with him as husband and wife, she could have easily done so; and in all probability would have been living with him at the time of his death.

The testimony of her son William John Craig as to the twenty dollars in money he obtained from his father, through his uncle Robert Craig; the incident of James Craig visiting Philadelphia and giving the daughter of Robert Craig a gold pencil and twenty-five dollars in money; together with the correspondence between the family of Robert Craig and James Craig, with the other

facts indicated by the testimony, very well support the theory that plaintiff, Mrs. Wilson-Craig, knew that her husband was alive and residing in St. Louis.

She says that her marriage to Wilson (which was adulterous by reason of having a legal husband living), was occasioned by Robert Craig telling her that James was dead; and then follows that unreasonable statement, that Robert afterwards told her he meant that James was dead as to her. The court was not bound to believe this statement in view of all the other testimony indicating that she never expected to become reconciled to her lawful husband. From the time of the receipt of the second letter from her husband, it is apparent that she was then determined never to live with him, and was simply awaiting for the happening of the conditions which her advisers had impressed her would release her before God and man. We are unable to reach any other conclusion than that if she had been possessed of that high conception of the marital relations all good wives should have, she would have been living with James Craig at the time of his death.

It must be remembered that the domicile of the husband should be the domicile of the wife. James Craig had requested her to accompany him to America. After her arrival, conceding that James Craig's conduct was not in every respect proper, yet she knew his residence, and if she expected to share in his accumulations, his residence should have been made hers. In the case of Messenger v. Messenger, 56 Mo. 329, the court very appropriately refers to the duty of the wife. Judge Napton, speaking for the court, says: "We have supposed it was the duty of the wife to live with her husband and abide by his fortunes in sickness and health, in poverty and riches, to make his will her law, where it is not in conflict with the law of God. . . . The question is one of desertion, and we hold that the wife is bound to follow the fortunes of her husband, and to live where he chooses to live, and in the style and manner

which he may adopt, and such will be the determination of a wife who is devoted to her husband, and who does not assume to be wiser than he is.''

The trial court had the right to analyze the testimony submitted to it in this cause, it was the trier of the facts, and in determining the weight to be attached to such testimony, to take into consideration the reasonable probability of its truth.

The findings of the court were for the defendants, and if the testimony reasonably supports those findings, it would not be in harmony with the purposes of the statute herein discussed, to permit plaintiff, Mrs. Wilson-Craig, after a voluntary separation from James Craig, for more than sixty years, and part of the time living in adultery with Thomas Wilson, having nothing to do with the accumulation of the property sought to be partitioned, to recover an interest in such property.

Entertaining the views as herein expressed, the judgment of the trial court will be affirmed.    All concur.